**NESTLE PRODUCTS, INC.**

v.

**UNITED STATES.**

**C.D. 3976; Protest No. 66/78991–9.**

United States Customs Court, Third Division.

March 6, 1970.

Reichard & Colberg, San Juan, P. R. (Ivan Reichard, San Juan, P. R., of counsel) for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Andrew P. Vance and Brian S. Goldstein, New York City, trial attorneys), for defendant.

Rafael A. Rivera Cruz, Asst. Atty. Gen., of the Commonwealth of Puerto Rico, as amicus curiae.

Before RICHARDSON and LANDIS, Judges.

RICHARDSON, Judge:

This protest case presents the question as to whether a resolution of the Secretary of Agriculture of the Commonwealth of Puerto Rico approved by the Governor of Puerto Rico and purporting to increase duties on coffee coming into Puerto Rico from the United States was effective to increase duties assessable against an entry made after the date of approval of said resolution on coffee shipped from the United States prior to publication in Puerto Rico of notice of the approval of said resolution. It is the contention of plaintiff-importer that the increase in duty is ineffectual as against the entry under protest because said entry was made prior to publication of notice of the approval of said resolution. The Government maintains that the duty increase was effective on the date of approval of the resolution by the Governor of the Commonwealth of Puerto Rico. Additionally, in a brief filed by the Assistant Attorney General of the Commonwealth of Puerto Rico as *amicus curiae*, the Commonwealth contends that this court lacks jurisdiction to determine the question of the validity of the duty increase because jurisdiction to determine such question is reposed in the courts of the Commonwealth of Puerto Rico.

The essential facts of this controversy are not in dispute. The merchandise at bar consists of 268,565 pounds of soluble raw coffee in glass jars which was shipped from the United States on May 15, 1966, and entered for consumption at San Juan, Puerto Rico, on May 24, 1966. On May 17, 1966, the Secretary of Agriculture of the Commonwealth of Puerto Rico, acting pursuant to provisions of 13 Laws of Puerto Rico Annotated, section 2201, which statute was enacted by the Legislature of Puerto Rico under authority of 19 U.S.C.A., section 1319 (section 319, Tariff Act of 1930), adopted a resolution under which the duty on coffee coming into Puerto Rico from the United States and foreign countries was increased from 42 cents per pound to 44 cents per pound. This resolution was adopted following a public hearing held on April 18, 1966, in Puerto Rico by the Commonwealth's Secretary of Agriculture on the subject of the proposed duty increase, of which hearing notice was given in the local newspapers. The ressolution was approved by the Commonwealth's Governor on May 20, 1966. And on June 16, 1966, notice of the approval of the resolution was published in the local newspapers in Puerto Rico.

At the time of entry herein estimated duties at the rate of 42 cents per pound were collected. But, thereafter, supplemental duties at the rate of 44 cents per pound were paid under the entry by plaintiff following demand therefor made by the collector at San Juan, predicated upon the resolution in question. It is the recovery of the supplemental duties, amounting to some $5,371.30, which constitutes the object of the instant protest.

Section 1319 provides:

The Legislature of Puerto Rico is empowered to impose tariff duties upon coffee imported into Puerto Rico, including coffee grown in a foreign country coming into Puerto Rico from the United States. Such duties shall be collected and accounted for as now provided by law in the case of duties collected in Puerto Rico. * * *

Section 2201 reads:

(No. 109)

(Approved June 29, 1965)

AN ACT

To amend section 1 of Act No. 77 of May 5, 1931, as amended,

entitled "An Act to impose an import duty on foreign coffee imported for use, consumption and sale in Puerto Rico".

BE IT ENACTED BY THE LEGISLATURE OF PUERTO RICO:

Section 1.—Section 1 of Act No. 77 of May 5, 1931, as amended, is hereby amended to read as follows:

Section 1.—As soon as this act takes effect, all coffee introduced into Puerto Rico shall pay a duty of

thirty (30) cents a pound for raw coffee and thirty-six (36) cents a pound if roasted or ground coffee, said duty to be collected by the Federal Customhouse Service established in Puerto Rico, under such regulations as it may promulgate therefor.

The Secretary of Agriculture is hereby authorized to reasonably reduce or increase the duty levied by sections 2201–2205 of this title, after a public hearing to that effect, in those cases in which, because of fluctuations in the market price of the product, or an increased or a decreased production, or technological changes, or the general conditions of the coffee industry, its economic stability is endangered, and such reduction or increase is, in his judgment, necessary for the protection of the consumer and the industry. If the duty imposed by such sections is increased, under no circumstance shall it exceed fifty-five (55) cents a pound for raw coffee and sixty-four (64) cents a pound if roasted or ground coffee. If said duty is reduced, under no circumstance shall it be less than twenty (20) cents a pound for raw coffee and twenty-four (24) cents a pound if roasted or ground coffee. Any reduction or increase determined by the Secretary of Agriculture shall be subject to the approval of the Governor. Any resolution increasing or reducing the duty levied shall be accompanied by a statement on the considerations borne in mind for making the change. The phrase 'introduced into Puerto Rico', as used in sections 2201–2205 of this title, shall mean the importation into Puerto Rico of coffee from any foreign country, as well as coffee brought into Puerto Rico from any state, territory, district or possession of the United States or any other place under the jurisdiction of the United States. The word 'coffee' as used in sections 2201–2205 of this title shall comprise raw, roasted, or ground coffee, or coffee prepared in any form; it being understood that in the case of the introduction into Puerto Rico of coffee preparations in any form other than raw, roasted, or ground coffee, the duty shall be computed on the basis of its equivalence in raw coffee, as provided in sections 2201–2205 of this title.

Section 2.—This act shall take effect immediately after its approval.

And the provisions of 48 U.S.C.A., section 740 read:

The duties and taxes collected in Puerto Rico in pursuance of the provisions of this chapter, less the cost of collecting the same, and the gross amount of all collections of duties and taxes in the United States upon articles of merchandise coming from Puerto Rico, shall be paid into the treasury of Puerto Rico to be expended as required by law for the government and benefit thereof, and the Secretary of the Treasury shall designate the several ports and subports of entry in Puerto Rico and shall make such rules and regulations and appoint such agents as may be necessary to collect the duties and taxes authorized to be levied, collected, and paid in Puerto Rico by the provisions of this chapter, and he shall fix the compensation and provide for the payment thereof of all such officers, agents, and assistants as he may find it necessary to employ to carry out the provisions of law. Apr. 12, 1900, c. 191, § 4, 31 Stat. 78; May 17, 1932, c. 190, 47 Stat. 158.

Inasmuch as the contention advanced by *amicus curiae* raises a jurisdictional issue we deem it appropriate to consider and dispose of such question first. The thrust of *amicus curiae's* argument against the existence of jurisdiction in this court to entertain the instant protest is that the statute sought to be construed in this court under the protest, namely, section 2201, is a statute enacted by a *sui generis* political entity which is no longer a territory or a possession of the

United States per force of the exercise by Congress of its constitutional right to dispose of its territorities, and that section 2201 is in essence a taxing statute subject to interpretation and construction only by and in the courts established by such political entity. There is no question but that Puerto Rico derived its present commonwealth status under a "compact" entered into between Puerto Rico and the United States as authorized by Public Law 81–600 [48 U.S.C.A., sections 731b–731e], entitled an Act "To provide for the organization of a constitutional government by the people of Puerto Rico." Defendant argues, however, that the commonwealth status enjoyed by Puerto Rico did not operate to give Puerto Rico a political status independent of United States sovereignty, and further, that such matters as the applicability of United States laws, customs, internal revenue, and federal judicial jurisdiction in Puerto Rico prior to the acquisition of commonwealth status by Puerto Rico, survived the change.

■ Although undoubtedly the "compact" realized greater local autonomy for the people of Puerto Rico in the relationship subsisting between Puerto Rico and the United States, we fully agree with defendant that Puerto Rico did not achieve independence from United States control and protection by virtue of the "compact", and also that the jurisdiction of the federal courts in Puerto Rico, among other things, has not been altered by its existence. That this conclusion is inescapable is clear from a reading of the legislative history of Public Law 81–600 itself. Thus, the House Committee on Public Lands, in recommending passage of the Bill S.3336 as passed in the Senate, states in its report: *

It is important that the nature and general scope of S.3336 be made absolutely clear. The bill under consideration would not change Puerto Rico's fundamental political, social, and economic relationship to the United States. Those sections of the Organic Act of Puerto Rico pertaining to the political, social, and economic relationship of the United States and Puerto Rico concerning such matters as the applicability of United States laws, customs, internal revenue, Federal judicial jurisdiction in Puerto Rico, Puerto Rican representation by a Resident Commissioner, etc., would remain in force and effect, and upon enactment of S.3336 would be referred to as the Puerto Rican Federal Relations Act. * * * Nor will it [S.3336] in any way preclude a future determination by the Congress of Puerto Rico's ultimate political status.

In view of the intent of Congress as expressed in this report, it is clear that the "compact" legislation was at most regulatory, and did not change Puerto Rico's fundamental political relationship to the United States. Moreover, insofar as federal judicial jurisdiction in Puerto Rico is concerned, the federal courts have held, consistent with the legislative intent, that such jurisdiction has not been affected by the "compact" legislation. Mora v. Mejias (C.A. Puerto Rico, 1953), 206 F.2d 377.

■ The authority of the United States Customs Court to preside over a protest against a collector's decision in a customs entry transaction derives from the provisions of 28 U.S.C.A., section 1583 which reads:

The Customs Court shall have exclusive jurisdiction to review on protest the decisions of any collector of customs, including all orders and findings entering into the same, as to the rate and amount of duties chargeable and as to all exactions of whatever character within the jurisdiction of the Secretary of the Treasury; decisions excluding any merchandise from entry or delivery, under any provision of the customs laws; and the liquidation or

---

* H.Rept. 2275, 81st Cong., 2d Sess. on S.3336 (June 19, 1950); U.S.Code, Cong.Serv. (1950) pp. 2681–2684.

reliquidation of any entry, or the refusal to pay any claim for drawback or to reliquidate an entry for a clerical error as provided by the customs laws. June 25, 1948, c. 646, 62 Stat. 943.

It will be readily observed that under section 1583 the jurisdiction of this court in protest proceedings extends to *any* collector of customs. And as we have noted hereinbefore in connection with section 740 the Secretary of the Treasury of the United States is responsible for the appointment and supervision of collectors of customs in Puerto Rico. Consequently, the reference in section 1583 to "any collector of customs" necessarily includes the collector of customs in Puerto Rico. And since neither section 1583 nor section 740 have been abrogated by the advent of the "compact" legislation for the reason stated herein, it follows that the jurisdiction of this court to entertain the protest at bar continues unabated.

 Neither can we agree with *amicus'* arguments that the sums of money sought to be recovered under the protest by plaintiff are "taxes" locally imposed by an autonomous political entity and collected by federal officials as agents of that entity, or that ownership of said monies have "vested" in the Commonwealth of Puerto Rico. Although section 2201 is of Puerto Rican origin, that statute is nevertheless derivative from federal enabling statutes, namely, sections 1319 and 740, which plainly and clearly denominate such monies as "tariff duties" and "duties", respectively. Monies designated as "duties" by statute cannot be treated as "taxes." Buscaglia v. Ballester, 162 F.2d 805 (1947). When sections 1319 and 740 are read together, as we feel they should be, they provide, in the case of monies collected in Puerto Rico, for the payment into the treasury of Puerto Rico of only the net proceeds of such monies, free of the burdens of collection, which burdens would include judicial proceedings to ascertain the legality and propriety of the collection of said monies. In short, what is conferred upon the people of Puerto Rico by the United States is in essence a gift that leaves nothing pertaining to it to be adjudicated in the local courts of the Commonwealth.

Turning now to plaintiff's protest claim itself, we observe that plaintiff has confined its claim to the sole issue of whether notice of the duty increase on coffee which was effected by the resolution adopted by the Secretary of Agriculture May 17, 1966, approved by the Governor May 20, 1966, which approval was published in the local newspapers in Puerto Rico June 16, 1966, was timely as to an entry made May 24, 1966, so as to make the duty increase applicable thereto. In support of its position plaintiff urges us, among other things, to adopt the standards of notice requirements contained in the federal Administrative Procedure Act, 5 U.S.C., section 1003(a), arguing that "the absence of published notice of rule-making procedure invalidates such rule even when the objecting party has had actual notice of the proposed change." And defendant counters with the argument that publication of the resolution of May 17, 1966 was not a prerequisite to its effectiveness, and also that the notice requirements of the Administrative Procedure Act are inapplicable to the construction of section 2201.

In our opinion the provisions of section 2201 embody a plan devised by the Legislature of Puerto Rico for future adjustment of established rates of duty on coffee coming into Puerto Rico which is complete within itself without reference to external criteria. It has not been suggested to us by either party nor have we found that the text of section 2201 is either obscure or ambiguous in meaning. Under such circumstances we do not feel at liberty or justified in looking elsewhere than to the law itself to determine whether its requirements have been fulfilled with respect to the duty assessment made against the entry at bar. See Shaw & Co. v. United States, 12 Ct.Cust. Appls. 88, T.D. 40024 (1924), and United States v. Innis, Speiden & Co., 7 Ct.Cust. Appls. 3, T.D. 36254 (1916).

■ But even if we were permitted to apply external criteria to the construction or interpretation of section 2201, we fail to see how the provisions of the Administrative Procedure Act aid the plaintiff here. Under section 1001(a) of that Act governments of the possessions and territories of the United States as well as the Congress of the United States are expressly excluded from its application.

■■ As to the requirements of section 2201, we find no provision therein requiring promulgation of the resolution of the Puerto Rican Secretary of Agriculture or any abstract thereof either upon its adoption or upon its approval by the Governor of Puerto Rico. That the Legislature of Puerto Rico could validly delegate the function of future duty rate adjustments to an administrative officer of the government is no longer open to doubt in this court. See Pan American Standard Brands, Inc., et al. v. United States, 43 Cust.Ct. 122, 127–128, C.D. 2115 (1959). And had the Legislature of Puerto Rico elected to perform such function itself instead of delegating it to the Secretary of Agriculture, the effective date of any ensuing rate adjustment statute enacted by such Legislature would have been measured from and after the date of approval by the Governor, under then existing law. See 13 Laws of Puerto Rico Annotated, section 2201, subsection 2, as amended. Section 2201 provides in part that: "Any reduction or increase determined by the Secretary of Agriculture shall be subject to the approval of the Governor." In this case the Governor approved the resolution of the Secretary May 20, 1966. The entry was made four days later, May 24, 1966. The resolution was effective the day the Governor approved it, and not the day his approval was published, June 16, 1966. The adoption of a resolution by the Secretary, pursuant to a delegation of legislative authority, which is subject to approval by the Governor may be equated to a legislative enactment which becomes effective when approved by the executive without publication. Lapeyre v. United States, 84 U.S. 191, 21 L.Ed.

606 (1873). In the absence of a constitutional or statutory requirement that there be a publication of a law before it becomes operative (and we are apprised of none in this controversy), it becomes operative upon its approval. Publication is not a condition precedent to its effective operation. Hassett v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858 (1938); Shwab v. Doyle, 258 U.S. 529, 42 S.Ct. 391, 66 L.Ed. 747 (1922).

■ Since plaintiff does not point to any departure of the Secretary of Agriculture from the requirements of section 2201 relating to the public hearing or to the considerations on which the Secretary's action was based, we are unable to find any basis upon which to sustain the protest claim. We, therefore, fully agree with defendant that plaintiff has failed to establish its contention that publication of notice of the rate adjusting resolution, after approval by the Governor, was a prerequisite to an increase in the rate of duty assessed against the involved entry. Consequently, the protest herein is overruled.

Judgment will be entered accordingly.